# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 14, 2010 Session

## MARGO FRESHWATER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-27089      W. Otis Higgs, Jr., Judge**

**No. W2009-02498-CCA-R3-CO   -   Filed May 5, 2011**

The petitioner, Margo Freshwater, was convicted of first degree murder and sentenced by the jury to imprisonment for 99 years. In 1970, she escaped from the Tennessee Prison for Women and was at large until 2002, when she was arrested in Columbus, Ohio, and returned to Tennessee to resume service of her sentence. She filed a petition for writ of error coram nobis which twice has been remanded to the trial court. The main issue in this appeal is whether the State withheld from the petitioner's counsel the statement of Johnny Box that the petitioner's co-defendant told him that he had been the lone shooter of the victim, which, had it been revealed to her counsel, more probably than not, according to the petitioner, would have resulted in a different judgment. Following our review, we concur with the argument of the petitioner in this matter. Accordingly, we reverse the petitioner's conviction for first degree murder and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded for New Trial**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

Stephen Ross Johnson, Knoxville, Tennessee, for the appellant, Margo Freshwater.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This matter has a long and complicated history. The facts of the crime were set out in the direct appeal:

On the evening of December 6, 1966, the Square D Liquor Store in Memphis was held up, the elderly gentleman who was alone tending store taken to the back room and his hands tied behind his back, whereupon while in that helpless posture he was shot to death.

Subsequent investigation pointed toward a Memphis lawyer, Glenn Nash, and the [petitioner]. They were arrested in Mississippi. Glenn Nash was adjudged insane by a Mississippi court, and remains there committed.

Upon the trial Margo Freshwater admitted that she was present while Glenn Nash robbed the liquor store and murdered the storekeeper; but denied that she was in any way an accomplice. She contended that her participation, such as it was, and her subsequent flight with Glenn Nash were under duress and coercion and because of a fear for her own life. The jury resolved this factual issue against her. It is contended that the evidence preponderates against the jury's verdict. To this we cannot agree.

We have meticulously reviewed the evidence against the [petitioner], and shall not endeavor to point out in detail all of its convicting elements. Suffice it to say that the jury was well justified in finding that the [petitioner] case[d] the liquor store in question with Nash earlier in the day, drove him to that store that night to the exclusion of other liquor stores passed in route, waited upon a customer while Nash was in the back with the victim, had in her possession a .22 caliber pistol and bullets, and the victim was shot with both a .38 caliber pistol and a .22 caliber pistol. She drove the getaway car, lived with Nash as man and wife as they traveled all over the southeast spending the fruits of the robbery, and never at any time did anything consistent with non-involvement or coerced involvement right up to the time that both were arrested as they left a bus in Mississippi. She did testify, without corroboration, that she tried to leave Nash in Chattanooga. When finally arrested, she denied her true identity, and did absolutely nothing consistent with being a true victim of coercion.

Freshwater v. State, 453 S.W.2d 446, 448-49 (Tenn. Crim. App. 1969).

Subsequent to the 1969 trial, the defendant escaped from prison and remained at large until 2002, when she was arrested in Ohio and returned to Tennessee. Following her return, she filed a petition for writ of error coram nobis, which is now before this court for a third time. In our first review of the petition, this court concluded that due process required tolling of the statute of limitations during the decades the petitioner was at large as to the claim

-2-

raised in a petition for writ of error coram nobis, that the State had withheld exculpatory evidence at trial:

>    The petitioner, Margo Freshwater, was convicted of first degree murder in 1969. Her conviction was affirmed on direct appeal. See Freshwater v. State, 2 Tenn. Crim. App. 314, 453 S.W.2d 446 (1969). In 2003, she filed a petition for writ of error coram nobis, alleging that new evidence existed that proved her innocence, as well as complaining of violations of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and juror misconduct that occurred at trial which necessitated a hearing and ultimately a new trial. Prior to a hearing, the trial court granted a motion to dismiss the petition because the petition was, inter alia, filed outside the statute of limitations. The petitioner seeks a reversal of the trial court's decision on appeal. Because due process requires the tolling of the statute of limitations for filing the petition for writ of error coram nobis with respect to the petitioner's claim of previously withheld exculpatory evidence, we reverse the judgment of the trial court and remand the matter for an evidentiary hearing on the petition. As to the remaining allegations of juror misconduct, we conclude those allegations could have and should have been addressed in a post-conviction petition and are now time-barred. Thus, we affirm the portion of the trial court's order dismissing the part of the petition for writ of error coram nobis pertaining to those claims.

Freshwater v. State, 160 S.W.3d 548, 550 (Tenn. Crim. App. 2004).

Subsequently, the trial court conducted an evidentiary hearing, as directed by this court, and determined that the petitioner had failed to show that presentation at trial of the suppressed exculpatory evidence "would have led to a different result." Following an appeal of this ruling, this court explained that the trial court had utilized an incorrect standard in its determination adverse to the petitioner and again remanded the matter to the trial court:

>    Petitioner, Margo Freshwater, again seeks relief from the trial court's denial of her petition for writ of error coram nobis. In an earlier appeal, after determining that Petitioner's petition for writ of error coram nobis was not barred by the statute of limitations, this Court remanded the matter to the trial court for an evidentiary hearing on the petition. See Freshwater v. State, 160 S.W.3d 548, 558 (Tenn. Crim. App. 2004). In that hearing on remand, Petitioner was to be given "the opportunity to establish that there is a 'reasonable probability' that the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial."

Id. Petitioner was also required to establish that she was "without fault in failing to present the newly discovered evidence at the appropriate time." Id. After conducting the evidentiary hearing on remand, the trial court denied the petition. The trial court ruled that this Court had already made the determination that Petitioner was without fault in failing to discover and present the evidence at the appropriate time. Further, the trial court determined that Petitioner failed to demonstrate that the presentation of the suppressed exculpatory evidence "would have" led to a different result if presented at Petitioner's trial. Because this Court's determination as to Petitioner's fault in the first appeal was applicable solely to whether the statute of limitations for presentation of the writ of error coram nobis should be tolled and because the trial court utilized a "would have" rather than a "may have" standard to determine whether Petitioner was entitled to coram nobis relief, we reverse and remand the matter to the trial court for further proceedings consistent with this opinion.

Margo Freshwater v. State, No. W2006-01758-CCA-OT-CO, 2008 WL 4560242, at *1 (Tenn. Crim. App. Oct. 8, 2008).

Following this second remand, the trial court reconsidered the proof presented at the 2006 evidentiary hearing, considered additional arguments from counsel, and, again, ruled adversely to the petitioner, concluding that, even had this evidence been presented at trial, there was no reasonable basis to conclude that it would have led to a different result:

[T]his court determines it is reasonabl[y] satisfied at [sic] to the veracity of the newly discovered evidence. However, the court found [sic] that the petitioner failed to demonstrate reasonable diligence could not have led to the discovery and presentation of the exculpatory evidence at trial. The court further finds, even if admitted, there is not a reasonable basis to conclude that the introduction of the new evidence may have led to a different result.

This matter is now before this court for a third time since the petitioner's arrest in 2002.

## ANALYSIS

On appeal, the petitioner challenges the conclusions of the coram nobis court, asserting that she was not at fault in not presenting at trial the newly discovered evidence and that had the statement of Johnny Box been presented at the trial, there was a reasonable probability that it "may have" resulted in a different judgment. The State disputes these

claims and, on appeal, presents its own argument that the petitioner's Brady claim is not cognizable in a coram nobis proceeding. We will review these claims.

## I. Whether Claims Based Upon Alleged Violations of Constitutional Rights Are Cognizable in Coram Nobis Proceeding

On appeal, the State argues that the coram nobis court should have summarily dismissed the petition because Brady claims are not cognizable in coram nobis proceedings. The petitioner responds that the State has waived this claim by not presenting it either in the coram nobis court or in its first brief filed on appeal. Additionally, the petitioner argues that, according to the law of the case, the petition for writ of error coram nobis was the proper means to seek relief in this matter.

We agree with the petitioner that the law of the case doctrine prohibits us from reconsidering this claim. The first time this matter reached this court, the State raised this same claim, that "a petition for writ of error coram nobis is not the appropriate remedy by which to seek relief from constitutional errors such as that asserted under Brady v. Maryland." Freshwater, 160 S.W.3d at 555. We concluded, however, that "the petitioner's allegations of newly discovered evidence are appropriately addressed in a petition for writ of error coram nobis." Id. at 556. As we explained:

> In the case herein, the petitioner's allegations of the newly discovered evidence in the context of violations of Brady v. Maryland, were not, and could not have been, litigated previously. Despite the petitioner's discovery request for statements of Mr. Box prior to trial, the existence of the evidence was not discovered until September of 2002 when current counsel for the petitioner and one of the original prosecutors reviewed the District Attorney's case file from the original trial. Further, at least one reported case from this Court, State v. Workman, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002), discusses coram nobis relief in the context of suppressed exculpatory evidence that also might amount to new evidence of innocence.

Id. at 555-56.

We have, therefore, previously considered and rejected the State's argument that the petitioner's claims of suppressed exculpatory evidence cannot be brought to this court through a petition for writ of error coram nobis.

## II. Coram Nobis Claims of the Petitioner

In order to understand the petitioner's claims, we must discuss what occurred before and during the trial.

The proof was undisputed that on the evening of December 6, 1966, the petitioner and Glenn Nash went together to the Square D Liquor Store in Memphis, where the lone clerk in the store, Hillman Robbins, Sr, was robbed, bound, and shot both by a .38 caliber and a .22 caliber pistol. After Nash and the petitioner subsequently were arrested in Mississippi, they were confined in the DeSoto County Jail. Johnny Box, who was another inmate at the jail during that time, later testified at the trial as a State's witness.

Earlier, Box had given to his own attorneys, who later passed it along to the State, a four-page, unnumbered, handwritten statement, which consisted of three pages of Nash's account to Box of the crime and a fourth page describing the petitioner's conversations and actions with Box at the jail. In the first three pages of the statement, Box related that Nash had told him that he and the petitioner had robbed the victim and taken him to a back room. According to Box, Nash said that he had shot the victim, using both pistols, while the petitioner was in the front of the store, where she waited on two customers before the shooting.

We will now set out in detail the facts upon which the petitioner relies in her coram nobis claim.

According to the testimony of Judge Terry Lafferty, who had been one of the prosecutors in the petitioner's trial, on June 20, 1968,[1] the petitioner's trial attorney, J. Frank Hall,[2] requested "copies of [the petitioner's] statements and any other statements that he was entitled to." This request was handwritten on a printed form, apparently of the Memphis Police Department, which also set out that Frank Hall, "defense counsel," had received a copy of the petitioner's oral statement, reduced to writing, made at the DeSoto County Jail, Hernando, Mississippi, on December 28, 1966,[3] at 11:00 a.m. to four officers of the Memphis Police Department. This form bears the typewritten language, which was stricken through, "Names and addresses of any additional witnesses to any oral and/or written statements is

---

[1]The trial in the matter began on February 4, 1969.

[2]Both the petitioner's attorney and the lead prosecutor for the State at the petitioner's trial were deceased at the time of the hearing.

[3]As we have set out, the crime occurred on December 6, 1966.

waived." At the beginning and end of this stricken-through language are the initials "J.F.H."

This receipt, signed by counsel for the petitioner, was used by him to request an additional statement, for, near the bottom, the form bears the following handwritten language:

Request is hereby made for copy of any statement of defendant to anyone that was reduced to writing, including that of any "informer" once held in the DeSoto County Jail.

This request bears the signature of the petitioner's trial counsel evidencing that on June 26, 1968, he received an additional statement from the Memphis Police Department.

Following the petitioner's capture in 2002, the petitioner's coram nobis counsel and Judge Lafferty reviewed the file of the Shelby County District Attorney General in this matter and came across the following memorandum, dated one day later than the handwritten request for the statement of any "informer," and bearing the initials of a "division leader" of the Shelby County District Attorney General's office:

Note to file:

On 6/21/68, I told Atty. Frank Hall, after conferring with Genl. Dwyer, that we would not furnish him a copy of the statement of Jimmy Box, since this witness, Jimmy Box, was not a law enforcement officer of the [S]tate of Tennessee, and the statement was not made in Tenn.

Before trial, the Asst. trying this case should check with the officers of the MPD who heard the oral statement of the def. and make sure that no one else was present at the time who heard this statement.

WDH
6/21/68

In their review of the records of the Shelby County District Attorney, counsel for the petitioner found, as well, the following four-page, handwritten statement of Johnny Box, who had been referred to in the June 21, 1968 "note to file" as "Jimmy Box":

Page 1[4]

      I am Johnny Box and am 22 years old. In March of 1965 I was convicted of grand larceny in Alabama and served 20 months of a 4-1/2 year sentence. On leaving Alabama I was sent to the DeSoto County Jail in Hernando, Mississippi. I am presently on parole from Alabama. DeSoto County had me charged with armed robbery and I received a 5 year suspended sentence.

      I came to the DeSoto County Jail on December 12, 1966 and have been there to this time. During part of this time in the DeSoto County Jail I was a cellmate of Glen Nash and in an adjoining cell to Margo Freshwater.

      During this time Glen Nash on various occasions told me the following facts: He told me that *he and Margo had robbed a liquor store in Memphis and that it was the one that had been written about in the newspapers. He said that he needed money and that Margo was helping him. He said after robbing the man they carried him in a back room and tied the man up and then shot him with a .38 cal. pistol and then a .22 cal. pistol. He said when the shooting happened he was in the back and Margo was in the front of the store. He said before he shot the man that one or two customers came in and that Margo waited on them. He said he thought she would never get* (emphasis added)

Page 2
*rid of them because it took so long and that she had to come into the back for change.* (emphasis added). He said that after the shooting they left in his Ford car and that Margo was driving. I think he said he got about $600.

      He said later they went to see a man named Paul in Chattanooga Tenn. He said they went through Georgia and stopped at a couple of nightclubs and motels. He said he would check out of motels without paying bills. On the way back he and Margo hocked their watches. He said that while he was in Chattanooga he was offered $2,000.00 to kill a man.

      He said they wound up in Florida and after they were there he killed a woman. He said he shot the woman with a .38 pistol. He said he first hit [her] on the head and didn't knock her out and she ran. He said he then shot her

---

[4]The handwritten document does not bear page numbers, but these were inserted for purposes of clarity when this document later was typewritten.

twice in the back. He said this happened in a drive-in store. He said he didn't get any money because people started coming in. He said Margo was in the car parked outside when he shot the woman.

He said he robbed a liquor store in Florida and got $37.00. He said Margo took the money out of the cash register. He said the liquor store was close to where he had killed the woman.

He said he and Margo came back to Memphis, Tenn.

Page 3

He said he had killed the cab driver Suratt in DeSoto County Miss. He said when he killed Suratt that he only had 7¢ and need[ed] money so he robbed and killed the cab driver. He said he had gotten the cab in Millington. He said he had put the gun on the cab driver in Memphis when he got suspicious of radio messages. He said they drove around quite a bit looking for a place to kill him and finally left Memphis and came to DeSoto County. He said they pulled off on a gravel road and then shot him through the head and took his wallet. He said he left some money in his pocket. He said he got about $30.00. He said at the time he shot the man Margo was outside the car trying to flag a car down. After the shooting they [illegible] a field and then caught [a] ride to some town and bought some clothes and then caught a bus to [illegible] where they were caught.

While in the cell adjoining Margo she also told me everything that Nash told me. She also told me that after Suratt was killed that she got rid of the .22 cal. pistol which she had. She said it was in a glove and she put it down behind a telephone pole. She said they had bought the gun at an anytime store in West Memphis, Ark.

Page 4

On three different occasions while I was in jail[,] Margo dug a concrete block out of the wall between our cells. On the first time Joe [illegible] was in my cell. It was around the end of January 1967. On two successive nights she came in and had relations with each of us. She did this on her own and we didn't even ask her to. When it was discovered the block was loose it was re cemented back. About one month later on Feb 23 1967 early in the morning

she came back into our cell. I have read the statement of Paul Adorna[5] dated March 3 1967 and agree with it and adopt it as my statement also. It is all there. On that night I had relations with her three times. She teased us a whole lot before she took the block out and it was her [illegible] to come over. She said that she had to have relations and couldn't stand it anymore.

I have read all of the above and it is all correct. This the 4th day of March 1967.

Johnny Box

Witnesses:

William L. Rome
George McIngrale

In sum, Johnny Box, an inmate at the DeSoto County Jail with Glenn Nash and the petitioner, and who was not listed on the indictment as a witness, made a four-page statement regarding statements made to him by Nash and the petitioner. The first three pages of the statement, which were not produced to defense counsel, related Nash's account of the crime, in which he stated that the petitioner aided him at the liquor store but that he alone shot the victim, using two pistols. The first three pages also contain Nash's account of other crimes he and the petitioner committed. The fourth page of the statement, which was apparently at some point provided to trial counsel for the petitioner, related that Box and Nash had relations with the petitioner while all three were inmates at the DeSoto County Jail but did not mention any criminal acts by Nash or the petitioner.

At trial, Box was called as a witness by the State and related the statements made to him both by Nash and the petitioner:

Q      Alright, would you please tell the Court and gentlemen of the jury what [the petitioner] told you concerning the hold up of a liquor store here in Memphis?

A      She said that attorney Glen Nash come by and picked her up and Nash said that they needed some money and they went down and robbed this liquor store and said that they went in and robbed the store. Nash took this guy in the back and shot him in the head and tied him up, I think he tied him up first,

---

[5]The record on appeal does not contain a copy of this statement, and Judge Lafferty was not questioned about it.

I don't know exactly, but he did tie him up and shot him two or three times in the head with a .38 and then shot him with a .22 and during the meantime while he was back in the back two or three customers came in, I don't know exactly and said that she waited on them when he was back there in the back and said that she thought she never would get rid of them. Said that she had to come back there and make change for one of the customers.

[DEFENSE COUNSEL] OBJECTS: Your Honor, I object.

THE COURT: Let me ask you now. You are telling us about what [the petitioner] said or are you talking about what Mr. Nash said? Now, you cannot state what Mr. Nash told you, you understand?

A     Yes, Sir.

THE COURT: What you are saying, was that what [the petitioner] told you or was that what Mr. Nash told you?

A     That's what both of them told me.

THE COURT: You can't state what he told you.

A     That's what she told me.

THE COURT: If she told you that, the Court will permit you to answer that but do not state anything that Mr. Nash said, told you.

[DEFENSE COUNSEL]: I would like to move the Court to instruct the jury to disregard anything that the witness said Mr. Nash said to him.

THE COURT: Alright, that's correct. Gentlemen, disregard anything this witness has said that Mr. Nash said to him. You understand? I think the last sentence there, he mentioned that he said so and so. Disregard that completely. Disregard anything that this witness says that Mr. Nash told him. Alright, go right ahead.

Q     Mr. Box, only tell the Court and gentlemen of the jury what this young lady told you.

A     She said that Nash picked her up and, you want me to tell the whole

thing?

[DEFENSE COUNSEL] OBJECTS: I object to him repeating "the whole thing."

THE COURT: Just what she has told you now.

A      That he went in the back and tied him up and shot him in the head with a .38 and then shot him with a .22. While he was in the back, well, two or three customers came in and she waited on them and she had a hard time getting rid of them and had to go to the back to get some change. After she got rid of them, they went out and got in Nash's Ford car and Nash told her to get under the wheel and drive and they left in his Ford car.

Thus, although it was not apparent at the time, Box related to the jury Nash's statement, which was consistent with the petitioner's testimony at trial that Nash, not the petitioner, had shot the victim with both pistols while the petitioner waited on customers at the front of the store.

Later in the trial, the petitioner, testifying as her only witness, told in detail on direct examination her activities the day of the crime, denying that she had shot the victim and relating Nash's explanation as to why he had fired two pistols into the victim:

Q      Did you drive to the liquor store you had been driven to that afternoon?

A      Yes, Sir.

Q      Alright, when you arrived at the liquor store, what happened?

A      He got out to go in and I noticed he was staggering and I was afraid he might make some kind of scene, so I got out to go in after him so that he would hurry up and I could get back to the rooming house. Well, after we got inside, oh, it wasn't too soon after we got inside that –

(INTERRUPTED)

Q      What happened?

A      He told the man to hold up his hands, it was a hold-up and I turned around stunned. I couldn't comprehend what was going on and he told the

-12-

man to put the money in the bag and he told me to get around the counter and he told us both to go in the back room and after we got in the back room, he told me that I had better be qui[et] and quit arguing with him, because I was arguing with him telling him it wasn't making any sense what he was doing, that this was insane, to quit what he was doing and everything. Well, a customer came into the store and he told me to wait on the customer and I said I wouldn't do it and he pushed me up against the wall and said I was going to do it, if I knew what was best for me, if I didn't want him to kill me. So, finally, I went out and waited on the customer and I realized there wasn't any money in the register, so I had to go back for change. I went back for the change and he gave it to me and I went out and gave it to the customer. Well, then I went back to the back room and Nash told me to stay there a few minutes and not to try anything funny, because he would kill me if I did and he said he was going back out to the front of the store and he went back out to the front of the store. Well, I looked down, I noticed the man was tied up. I bent over to untie the man and Nash came back and found me. He picked me up and slapped me a couple of times and he said, "Didn't I tell you I would kill you, if I caught you trying to do something I told you not to do?" And, I said, yes, and I said, "But, please, don't kill me." I said, "Don't do anything, don't do anything like this." And, he said, "Do as I say or I'm going to kill you." And, so he went and kicked this board beside the door, this back door. There was this real heavy board against it and he told me to walk out the back door and walk very slowly and not to try . . . anything funny. I walked out of the door and as I got to the car, I heard some noises and it sounded [like] a backfire or something and when it finally registered in my head what it might be, I tried to decide whether I should run, whether I could get away from him or not and he came out and told me to get in the car behind the wheel. So, I got in and by that time I was crying and asking him why he was doing this and all and he said it was his business and then he told me that if I left him and went to the cops and told the story that the witness that had seen me, the guy that came in the store, had seen only me and that he had left a piece of the gun in the store and that he had used two guns to indicate that there were two people involved and he said that if I left him and went to the cops, I would be the one put behind the bars forever and he said that if I left him and didn't go to the cops, I would not only be hunted by every cop in the country, but I would be hunted by him and I would be found by him and killed by him.

The State later cross-examined the petitioner regarding her explanation of the events:

Q      Miss Freshwater, . . . you tell this Court and this Jury that you had no

-13-

place to go whatsoever the whole time that you were with Glen Nash?

A       No, Sir, I didn't.

Q       You did not?

A       No.

Q       Well, let me ask, didn't you hope to God you could see a policeman or somebody to get away from this man who had told you he had killed somebody?

A       I told you I couldn't go to the police.

Q       Why not?

A       Because he told me if I had, I'd go behind bars because that one witness saw me.

Q       That's what he told you.  Of course, Glen Nash is not here and we haven't heard Glen Nash testify or whatever Glen Nash would say, have we?

A       No, Sir.

Q       All we have got is your word for what has taken place out there, is that correct, Miss Freshwater?

A       Yes, Sir.

Q       Now, these times that you've had the opportunity to get away from him, you say you didn't know where to go.  That's what you told Mr. Hall, isn't that the words that you used?

A       Yes, Sir, I didn't know where to go.  There wasn't anyway I could get away from him and still live.

Q       And still live.  Well, how was he going to get to you, say if you had turned yourself into the police authorities?

A       Then I would be behind bars for the rest of my life.

-14-

The State further questioned the petitioner:

Q      . . . You didn't make any attempt to run out when you saw Glen Nash with a gun on this fellow, is that correct?

A      That's right.

Q      And, then Mr. Nash just calmly turned to you and told you to get behind the counter, is that right?

A      He didn't calmly tell me.  He told me in a rather rough tone.

Q      In a rough tone, but he didn't turn the gun on you, did he, Miss Freshwater?

A      Yes, he did.

Q      Oh, he turned around and took the gun off – (INTERRUPTED)

A      He turned around and said, "Get over there."

Q      Did he point the gun at you?

A      He said, "Get over there like that."

Q      "Get over there like that."  Now, what was [the victim] doing at that time?

A      He was standing there.

Q      Standing there.  Did you get behind the counter with [the victim]?

A      I came around to the counter and he had just finished putting the money in the bag.

Q      In the bag.

A      And, that's when he told us both to get in the back room.

Q      Where did [the victim] get the money from?

A      I wasn't paying any attention where – from the cash register is all I know.

Q      Did you see him actually punch the cash register and open it and take the currency out?

A      Yes, Sir.

Q      Isn't it a fact he got out [sic] from a little wire basket, Miss Freshwater?

A      I didn't notice that. I wasn't paying any attention. I was too shocked.

Q      You were still in a state of complete shock?

A      Yes, Sir.

Q      Well, at anytime, did you tell Mr. Nash or beg him to stop this?

A      Yes, I did.

Q      How many times?

A      Quite a few. I kept it up.

Q      Mr. Nash is not here. [The victim] is dead, is that correct?

A      Yes, Sir.

Later, in closing argument, the State reminded the jury that the petitioner's claims as to her lack of involvement were not corroborated by other witnesses: "Where are these witnesses she has talked about to corroborate her story? Where is Paul Ritchie, who was out in the car when she said she was in an argument with Glen Nash? He is not up here testifying on her behalf. And neither is this fellow, Bill, that she says she doesn't know the man's name."

The State has not contended, either before the coram nobis court or on appeal, that the original rationale for refusing to provide a copy of Box's entire statement, that it was not made to a law enforcement officer and was made in another state, are legitimate reasons for refusing to provide a copy of Box's complete statement to the petitioner. In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the prosecution

-16-

has a duty to furnish to the defendant exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. The Court explained that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id.

Thus, in refusing to provide a copy of Nash's statement to Box, the State violated the petitioner's rights to be provided Brady material. The problem was compounded when only the fourth page of the statement was provided, for it appeared to be a complete statement and provided no clue that there were additional pages, which were exculpatory to the petitioner, and that the State was withholding.

The petitioner argues that, following the second remand, the court did not follow the standard set out in State v. Vasques, 221 S.W.3d 514 (Tenn. 2007), and that had the court done so, its determination would have been that "there is a reasonable probability that the suppressed confession of Glenn Nash may have resulted in a different judgment had it been admitted at petitioner's original trial." We now will determine whether the failure of the State to provide a copy of the statement entitles the petitioner to relief.

In Vasques, 221 S.W.3d at 527, our supreme court set out the considerations to be followed by a coram nobis court in weighing such a petition:

> In an effort to amplify the standard established in Mixon and confirmed by our own decision in Workman, we hold that in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result. In the Court of Criminal Appeals opinion in this case, Judge Joseph M. Tipton described the analysis as follows: "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Although imprecise, our standard, which requires determination of both the relevance and the credibility of the discovered information, offers a balance between the position of the State and that of the defense.

We will review the petitioner's claim that the coram nobis court did not properly apply this standard.

## A. Newly Discovered Evidence

First, the coram nobis court concluded that "the evidence in question is what it purports to be; namely, a statement given by jail house informant Johnny Box, and that the statement was in fact given by Box prior to trial and has not been altered or manipulated." The court, likewise, stated that it was "reasonably well satisfied as to the veracity of Nash's statements to Box":

> There is no doubt Box, Nash and Freshwater were housed together in Mississippi. The State certainly believed Box enough to present his testimony at trial and the trial court allowed Box to testify – albeit in limited form. Thus, the trial court obviously found Box's credibility was not so far outside the bounds of what was reasonable that his testimony should not be submitted for the jury's consideration. Thus, to now find the veracity of the portion of the Box statement that comprises the newly discovered exculpatory evidence is so compromised that it should not be considered in determining whether a new trial should be granted seems unfair.

We conclude that the record supports this determination.

## B. Whether the Petitioner Was at Fault in Not Presenting the Exculpatory Evidence at Trial

The next step of our inquiry is to determine whether the petitioner was without fault in not presenting the evidence at trial. As to this determination, the coram nobis court found that the "petitioner has failed to demonstrate she is without fault in failing to timely discover the new information." The court noted that "when Judge Lafferty was asked if he knew for a fact whether or not this information was given to defense counsel, he replied that he 'could not say for sure one way or the other.'" The court concluded that, "in light of the record at trial, it is more plausible that counsel knew Nash had made statements to Box. It is possible his own client was aware that Nash had also provided statements to Box and informed counsel of this fact." As its basis for this conclusion, the court noted that it "appears that defense counsel was aware that Nash and Box were housed together in the jail and that Nash had spoken with Box regarding his alleged crimes." As further proof that the petitioner was aware that Nash had made statements to Box and told her lawyer of the fact, the court noted that assignment of error number 7 at the petitioner's motion for new trial claimed that she was prejudiced because "the State's witness, Johnny Box, testifying as to what Glenn Nash admitted to him after the termination of the alleged conspiracy, while Box, Freshwater and Nash were in jail at Hernando, MS."

Additionally, the court noted that, while it was not clear from the record that petitioner's counsel knew "that Nash told Box he acted alone in shooting the victim," it was "plausible counsel made a strategic decision to attempt to exclude all of Nash's statements to Box, even the exculpatory statements, in an effort to prevent the jury from hearing testimony about the couple's continuing criminal episode including additional murders in Florida and Mississippi."

We disagree with much of the foregoing reasoning. We find no basis in the record to assume, as the coram nobis court did, that "it is more plausible that counsel knew Nash had made statements to Box." There, likewise, is no basis in the record for assuming that the petitioner was aware that Nash had provided statements to Box, or that she informed her counsel of that fact. As for counsel's assignment of error number 7 in the petitioner's motion for new trial, that his client was prejudiced because Box had testified as to hearsay, we can assume nothing other than counsel was making all the arguments that were available.

The coram nobis court, based on the assumptions mentioned above, concluded that "counsel could have discovered Nash's admissions prior to trial." Its order denying coram nobis relief states in pertinent part:

> A simple interview with Box would have likely revealed the relevant Nash admissions. Since counsel was aware Nash made a statement of some sort, the discovery of the precise nature of those statements would not have required extraordinary measures. A phone call to Box's Mississippi counsel may have even uncovered the exculpatory statements. As previously indicated, although it appears counsel failed to do so, it is more likely that counsel was aware of the full scope of Nash's statements to Box and made a strategic choice to attempt to exclude the more salacious details of the couple's subsequent crime spree. Regardless, this court finds petitioner has failed to demonstrate she is without fault in failing to timely discover the new information.

We respectfully disagree with these conclusions. Although the State had not prepared the statement, the manner in which it was produced to the defense was misleading. As we have explained, the pages were not numbered, and Box and two witnesses had signed the fourth page, that which was produced to the petitioner's counsel. Clearly, production of only that page, which bore the signature of Box and witnesses and made no reference to the fact that there were previous pages, made it appear that it was the entire statement.

In <u>United States v. Bagley</u>, 473 U.S. 667 (1985), the court explained how an incomplete response to a <u>Brady</u> request may mislead the defense into thinking that certain

evidence does not exist:

> We agree that the prosecutor's failure to respond fully to a <u>Brady</u> request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

<u>Id.</u> at 682-83.

This effect is explained further by Wayne R. LaFave, 6 Crim. Proc. § 24.3(b) (3d ed.):

> Where the request is narrow and precise, giving the prosecutor considerable direction as to what is wanted, such as a request for statements of a particular person, or a request for reports by particular experts, defense counsel is more likely to treat the prosecutor's failure to disclose as an indication that the evidence does not exist.

We disagree with the coram nobis court's conclusion that the petitioner's counsel could have obtained a copy of Box's statement or interviewed him by contacting his Mississippi attorney because the record does not show whether Box's counsel would have made his client or his statement available. Likewise, we disagree with the court's determination that "it is more likely that counsel was aware of the full scope of Nash's statement to Box and made a strategic choice to attempt to exclude the more salacious details of the couple's subsequent crime spree." Because there is nothing in the fourth page of Box's statement to suggest that it was not the entire statement, the production of it to trial counsel would not have suggested to counsel that other pages existed. As for the court's conclusion that trial counsel made a strategic decision to attempt to exclude Nash's confession, we note that Nash's confession had already been related to the jury through the State's witness, Johnny Box. Thus, trial counsel could have asked simple and directed questions to get Box to explain what he meant by saying, on direct examination, that "both" had told him that Nash shot the victim. It is unclear how asking a witness simply to clarify prior testimony could open the door for proof of other crimes. Accordingly, we conclude that the coram nobis court erred in its determination that the petitioner was at fault for not presenting the exculpatory evidence at trial.

## C. Whether Evidence May Have Resulted in a
## Different Verdict Had It Been Presented at Trial

### 1. Admissibility

The State contends that a statement of Glenn Nash to Johnny Box would have been inadmissible hearsay. However, this court concludes that the evidence would have been admissible. The situation at the trial was that Johnny Box had already testified as to a third party confession, that of Nash that he had used both weapons to kill the victim. The problem was that only Box and the State knew this. Therefore, the statement of Nash already was before the jury.

### 2. Exculpatory Nature of the Evidence

The court observed that, while the statement was exculpatory, "[t]he ultimate question is what effect . . . the newly discovered evidence may have had on the outcome if presented at trial." The court noted that "[i]f the jury questioned Box's credibility as it related to his testimony regarding statements made to him by [the petitioner], then it is just as likely that they would have questioned his credibility as to his claims regarding the statements made to him by Nash." The court, concluding that "Box's credibility was arguably suspect," explained problems the jury may have had with Box's testimony:

> Certainly the jury may have questioned Box's motives. They may have determined he had merely given the statement in question in an effort to help himself or they may have determined such statement was given in an effort to aid the petitioner. In such case, the jury may have rejected Box's entire statement, including the exculpatory portions of Nash's admissions. Under such circumstances, a reasonable probability would not exist that the newly discovered evidence may have led to a different result if introduced at petitioner's trial.

The court determined that "even if the jury believed Nash made the exculpatory statements to Box and gave considerable weight to Box's testimony, there is still not a reasonable probability that a different result may have been reached in petitioner's case."

As we will explain, we disagree with this conclusion.

### 3. Effect of Nash's Statement on the Jury

The coram nobis court concluded that Nash's statements to Box did not absolve the

petitioner of liability for the homicide:

> While the statements given by Nash to Box would have further corroborated [the petitioner's] testimony that she was not the shooter, they do nothing to corroborate her testimony that she was under duress. Likewise, her own statements to Box do nothing to bolster her testimony in this regard.

During closing arguments, the State stressed that Nash fired the .38 while the petitioner, herself, wielded the .22:

> Now, as I have stated, by no means am I conceding this young lady is an aider and abettor. I submit to you under this proof that after deliberation on your part you could find her just as guilty of pulling that .22 caliber pistol with the slug going through the back of the neck of [the victim].
>
> . . . .
>
> . . . [G]entlemen of the jury, the facts in this record show quite clear the plans laid that afternoon, the purchase of the guns, and I submit to you Glen Nash had a .38-caliber pistol. That is the gun used by a man in this holdup. That gun would have been too heavy for this young lady, she was 18 years of age, a .22-caliber pistol would have been more suited for her, it is a smaller gun. It only cost $16.00, according to that report. This is a gun that she quite adequately could have handled under the circumstances. It isn't a .38, it is not a heavy gun, as you gentlemen probably have had some experience, these lightweight .22's.
>
> . . . .
>
> . . . She knew what was going on in there. She was back there when Glen Nash shot that man. And those are the facts in this record, gentlemen of the jury, you can believe that she had the .22, because Dr. Francisco told you the fleshwound going through the back of the neck of [the victim] could have been caused by a .22 because there was a spent .22 slug found there and the ejection rod from a .22, a .22-caliber pistol fit for use by a woman. And she gets rid of it, according to Johnny Box, in Greenville, Mississippi. The natural assumption of it being she had the .22, and the natural inference, she had the .22 when [the victim] was shot.
>
> . . . .

-22-

. . . Glen Nash didn't cover up his face and [the petitioner] didn't cover up her face because they knew what they had in mind. They eliminated and executed . . . [the victim], and that is the best way to get rid of a witness. The only way, they executed him. And there sits one of your executioners, right there, that sweet little 18-year-old girl that he wants you to believe that she is. She is an executioner, gentlemen, just as much as Glen Nash was an executioner. And she executed [the victim] on the night of December the 6th of 1966, or she assisted with a .22 pistol.

You heard Dr. Francisco testify of a wound. There were two exit wounds. There were three slugs recovered from [the victim's] head. Dr. Francisco returned these three slugs over to Lieutenant Biggert, he identified them. There were two found at the scene. You saw the photograph, Exhibit Four. A slug identified as a .22, a .22 ejector rod and a .38. And, gentlemen, there were two exit wounds in [the victim's] head, and Dr. Francisco said that one of them could have been caused by a .22 shell. And what do we find in this sweet 18-year-old's purse that she doesn't know how it got there? What do we find? We find a .22 caliber shell.

. . . .

[Defense counsel] says there is no hard proof that the State of Tennessee presented to you 12 gentlemen that she had a .22 pistol, no proof, whatsoever. What did Johnny Box say? He testified . . . that [the petitioner] told him she had a .22 pistol, that she wrapped it in a glove or put it in a glove and disposed of it by a telephone pole in Greenville, Mississippi. . . . [The petitioner] had these shells for one purpose and one purpose alone, to use in the .22 that she kept. And, gentlemen, I submit she did use that .22 pistol. She used it the night of December the 6th, when she fired and shot [the victim] in the lower part of the head, on his neck. She used it that night. And as she sits there, gentlemen, and looks at you, she knows she used it. She knows very well that she used that .22 pistol and assisted in the execution of [the victim]. As sure as I am standing here, she knows that.

Thus, the State made repeated arguments that the petitioner had wielded the .22 pistol as she and Nash shot the victim to death. While, obviously, printed words cannot reveal the emotion with which they were spoken, these were delivered as the closing arguments in a case in which the State was seeking the execution of the petitioner. We presume they were forceful and emotional. The coram nobis court noted that the testimony at the hearing was

the State's theory that the petitioner was guilty either as a participant in the shooting or by aiding and abetting the crime. We agree with the coram nobis court that, even believing the petitioner's version of the events, jurors reasonably could have found her guilty of the crime with which she was charged. However, since this trial occurred at a time when jurors determined both guilt or innocence as well as the sentence, we next must determine whether a reasonable basis exists for concluding that, had the jurors known that Nash said he was the sole shooter, they still would have set her sentence at ninety-nine years, rather than the twenty-year minimum.

In assessing the effect that Nash's confession might have had on the jury, the court speculated as to the impact of the State's presenting evidence as to subsequent crimes committed by Nash and the petitioner:

> Finally, in addition to bolstering the State's case in chief, had the additional admissions by Nash to Box relating to the murders in Florida and Mississippi been admitted, the jury may have been even more inclined to both convict and give petitioner a significant sentence. Certainly, such testimony would have further discredited petitioner's claims that she was coerced by Nash into participating in the robbery. Thus, considering the new testimony in light of the testimony that was introduced at trial, this court is simply not persuaded that there is a reasonable probability that had Nash's admissions to Box been introduced a different result may have occurred. Or using Judge Tipton's language, this court does not find a reasonable basis exists for concluding that had the evidence been presented at trial, the results of the proceeding might have been different. See Vasques, 221 S.W.3d at 527.

However, this proof was not presented at trial and, thus, we cannot speculate as to whether, had the jury known of the subsequent crimes, the petitioner's sentence would have been in excess of twenty years.

There was both substantial age and social disparity between Glenn Nash and the petitioner. She was 18, with limited education, and Nash, who was 38 at the time of the crime, was the lawyer for her boyfriend. Given this, we cannot conclude that, had the jury known that Nash confessed to one of the State's witnesses that the petitioner had not shot the victim, she would both have been convicted of first degree murder and sentenced to ninety-nine years imprisonment, far greater than the twenty-year minimum for that crime. For these reasons, we respectfully disagree with the conclusion of the coram nobis court and conclude that, had the jury known that State's witness Johnny Box had made a statement that Glenn Nash had confessed to being the sole shooter, "there is a reasonable probability" that this evidence may have resulted in a different judgment.

-24-

Thus, applying the holding of our supreme court in <u>Vasques</u>, we conclude that, if the petitioner's trial counsel had been provided with a copy of the first three pages of the statement of Johnny Box, repeating that Nash had confessed that he was the sole shooter of the victim, for use in the cross-examination of Box, there is a "reasonable probability" that the petitioner would not have received a sentence of ninety-nine years. For this reason, we reverse the conviction and remand for a new trial.

## **CONCLUSION**

We reverse the conviction of the petitioner for first degree murder and remand the matter for a new trial. In view of the history of this matter, we decline to set an appeal bond.

_____
ALAN E. GLENN, JUDGE