IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 13, 2016 Session

## DESHAWN LAMAR BAKER v. STATE OF TENNESSEE

Appeal from the Criminal Court for Davidson County
No. 2009-B-1373    Mark J. Fishburn, Judge
_____

No. M2015-02152-CCA-R3-PC – Filed January 23, 2017
_____

Petitioner, Deshawn Lamar Baker, appeals the lower court's order denying post-conviction relief from his convictions for aggravated robbery, conspiracy to commit aggravated robbery, and being a felon in possession of a handgun.  On appeal, Petitioner argues that trial counsel provided ineffective assistance and that the State withheld exculpatory evidence, violating his right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963).  Upon our review of the record and applicable authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

John Tennyson (at hearing and on appeal) and James Wiggington (at hearing), Nashville, Tennessee, for the appellant, Deshawn Lamar Baker.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

Over seven years ago, Petitioner was convicted by a Davidson County jury of aggravated robbery, conspiracy to commit aggravated robbery, and being a felon in possession of a handgun. He received a sentence of eighteen years.  On appeal, Petitioner argued that the evidence was insufficient to support his convictions and that the State committed prosecutorial misconduct by failing to disclose key evidence in a timely

manner.  *State v. DeShawn Lamar Baker*, No. M2011-00946-CCA-R3-CD, 2013 WL 1279180 (Tenn. Crim. App. Mar. 28, 2013), *perm. app. denied* (Tenn. Sept. 10, 2013). This Court determined that Petitioner had waived the claim of prosecutorial misconduct by failing to make a contemporaneous objection.  *Id*. at *8.  We also held that the evidence was sufficient to support Petitioner's convictions and affirmed the judgment of the trial court.  *Id*.

## I. Trial

The proof presented at trial showed that in July 2008, the victim, Andrew Osborne, was shopping at Jimmy's Bi-Rite in Nashville before returning to the parking lot.  As he was walking to his car, he was approached by two African-American males, later identified as Petitioner's codefendants, John Peoples and Bobby Beples,[1] who was a juvenile at the time.  The victim opened his car door and sat down.  Mr. Peoples pulled a gun out of his waistband and pointed it at the victim's head, saying "Let's go, come up off your shit, give me your stuff."  The victim emptied his pockets, dropping his keys, wallet, cell phone, and some coins on the ground.  Both men grabbed the items, except for the victim's cell phone.  Mr. Peoples began patting the victim down, but then he and Mr. Beples ran off when a van pulled up next to them.  The victim retrieved his phone from under the car, ran into the store to tell the clerk that he had just been robbed, and called 911.

The victim testified that, prior to the robbery, he had noticed the two men in the store along with a third male, later identified as Petitioner.  He testified that Petitioner was wearing a green hat and a white shirt and that Petitioner had been "eyeing" him while he was in the store.  The victim testified that Petitioner was "walking past [the victim] and like looking over, looking at [the victim]."  When the police arrived, the victim gave them a description of Petitioner "because that's who [he] first remembered vividly as being in the store."  The victim was able to recover his wallet after someone found it, but it was empty.

Officer Mike Abbott of the Metropolitan Police Department testified that he responded to the robbery at Jimmy's Bi-Rite.  He spoke to the victim, who provided a description of the suspects.  He also viewed the store's surveillance video for the time of the robbery.  The victim identified himself and Petitioner on the surveillance footage.  Officer Abbott radioed other officers to be on the look-out for at least two suspects, one of whom was described as wearing a green hat and a white shirt.

---

[1] This individual's name is spelled "Pebbles" in the indictment and "Peebles" in the direct appeal opinion, the post-conviction court's order, and Petitioner's appellate brief.  However, during the post-conviction hearing, he testified that his name was spelled "Beples," and that is the name we will use throughout this opinion.

On the day of the robbery, Petitioner and his codefendants went to the home of Lena Boleyjack and her children in order to wish the eldest daughter a happy birthday. Ms. Boleyjack testified that Mr. Peoples and Mr. Beples left but that Petitioner was sitting on her porch when "police cars started coming around." Ms. Boleyjack told Petitioner several times not to go into her house, but he ran inside when the police surrounded the house. Ms. Boleyjack's daughter, Sharon Campbell, testified that Petitioner ran upstairs to one of the bedrooms. Ms. Boleyjack testified that, to her knowledge, Petitioner and his codefendants had not gone upstairs prior to the police arriving. The police surrounded the house to prevent Petitioner from escaping out the back. The police ordered Petitioner several times to come out of the house over the loudspeaker before Petitioner walked out and was taken into custody. Petitioner was still wearing a green hat and a white shirt. After Petitioner was arrested, police located Mr. Peoples and Mr. Beples about six blocks away from the Boleyjack residence.

The police recovered a gun from under a mattress in one of the upstairs bedrooms in the Boleyjack residence. Ms. Boleyjack testified that no one in her family owned a gun. Several months later, Ms. Campbell was cleaning under a dresser in her bedroom when she found a wallet underneath it. She gave the wallet to her mother, who discovered that it contained both Petitioner's identification as well as the victim's driver's license. The wallet was found in a different bedroom from where the gun had been found. Ms. Boleyjack turned the wallet over to the police. Photographs of the wallet's contents were entered into evidence, but the actual wallet was lost sometime before the trial.

After Petitioner was apprehended, Detective William Stewart drove the victim to the Boleyjack residence where he identified Petitioner as one of the individuals who robbed him. Detective Stewart then drove the victim to where Mr. Peoples and Mr. Beples had been located, and he identified them as well. Detective Stewart later conducted a recorded interview of Petitioner. Petitioner admitted that he was in the store with Mr. Peoples and Mr. Beples but denied any involvement in the robbery. Petitioner stated that he left the store and that, when he met up with the two men later, he suspected that they had done something because Mr. Peoples had a wallet and a gun and Mr. Beples had a set of keys. Petitioner denied hiding the gun in the Boleyjack residence.

Mr. Peoples testified for the State. He admitted that he pled guilty to aggravated robbery for the incident at Jimmy's Bi-Rite. Mr. Peoples stated that he did not remember either the statement he gave to Detective Stewart or the statement of the facts read by the prosecutor at his plea hearing. After consulting with an attorney and having his memory refreshed with the transcript of his plea hearing, Mr. Peoples gave the following account of what transpired during the robbery.

Mr. Peoples testified that Petitioner and Mr. Beples went into the store while he remained outside talking to someone who wanted to buy some pills. Petitioner and Mr. Beples eventually came out of the store and joined Mr. Peoples in the parking lot. Mr. Beples stated, "Guy in there got some cash," and Petitioner gave Mr. Peoples a gun. Mr. Peoples admitted that he and Mr. Beples robbed a man and fled the scene. The two men were later apprehended at Mr. Peoples's grandmother's house.

Mr. Peoples denied that he pointed the gun at the victim or that he "stuck the gun in the man's face." Mr. Peoples testified that he simply showed the gun to the victim. He told Detective Stewart that he had given his gun to Petitioner earlier. Mr. Peoples testified that he did not know what happened to the contents of the victim's wallet because Mr. Beples picked it up. Mr. Peoples testified that he had known Petitioner for only two weeks before this incident. Mr. Peoples admitted that he and Mr. Beples met up with Petitioner at the Boleyjack residence after the robbery.

Mr. Peoples testified that much of his statement to Detective Stewart was "made up" because he was afraid that he would be "locked up" by himself. Mr. Peoples admitted that he agreed with the State's statement of the facts at his guilty plea hearing but testified that he did so because he was afraid that he would get more jail time for lying. On cross-examination, Mr. Peoples testified that he had been in the upstairs bedrooms of the Boleyjack residence before. Mr. Peoples also admitted that he had never spoken to trial counsel prior to his testimony.

## II. Motion for New Trial

At the hearing on Petitioner's motion for new trial, Mr. Peoples testified that he was sentenced to eight years on his plea to aggravated robbery. Mr. Peoples wrote an affidavit in April 2010, stating that the prosecutor told him that he was facing twenty to thirty years but offered the eight-year plea deal in exchange for his testimony against Petitioner. Mr. Peoples testified that Petitioner did not coerce him into writing the affidavit. Mr. Peoples stated that his testimony at trial that Petitioner handed him the gun before the robbery was false and that Petitioner was not present when he and Mr. Beples robbed the victim. Mr. Peoples testified that a prosecutor told him what to say and that he felt that he had to go along with it to avoid additional jail time. Prior to accepting his plea, Mr. Peoples had been told that Petitioner would testify against him. Mr. Peoples said that he lied on the witness stand in order to get a better deal.

The prosecutor testified that he never had any contact with Mr. Peoples without his attorney present. He testified that he discussed the possibility of Mr. Peoples's testifying against Petitioner but that it was never a formal part of the plea deal. The prosecutor testified that Mr. Peoples acted confused and was lying at the beginning of his testimony during Petitioner's trial. The trial court appointed an attorney to discuss with

- 4 -

Mr. Peoples the possibility of being charged with perjury prior to Mr. Peoples resuming his testimony and implicating Petitioner. The prosecutor testified that after Mr. Peoples pled guilty, it would not be possible for any member of the District Attorney's Office to change the agreement.

### III. Post-Conviction Hearing

In June 2014, Petitioner filed a petition for post-conviction relief. Counsel was appointed, and an amended petition was filed on October 27, 2014. A second amended petition was filed on March 4, 2015. Petitioner alleged that he had received ineffective assistance of counsel when trial counsel failed to adequately investigate the case and prepare for trial, including speaking to witnesses and Petitioner's codefendants; failed to communicate plea offers to Petitioner or explain to Petitioner the concept of criminal responsibility; failed to provide Petitioner with a copy of the discovery materials; and failed to request a continuance or object to the admission of late-disclosed evidence, thereby waiving the issue on appeal. Petitioner also requested a writ of error coram nobis based on the State's alleged failure to turn over exculpatory evidence under *Brady*, namely a supplemental police report containing the statement of an independent third-party witness. A post-conviction hearing was held in July of 2015.

At the hearing, Mr. Peoples testified that he had been warned not to commit perjury during his testimony against Petitioner at trial. Mr. Peoples identified the affidavit he signed, and it was entered into evidence. Mr. Peoples testified that his trial testimony against Petitioner was false. Mr. Peoples stated that he lied during the trial because the prosecutor threatened him with twenty to thirty years' incarceration. Mr. Peoples denied knowing that his testimony at Petitioner's trial could not affect his plea deal.

Mr. Peoples further stated that, before the robbery, Petitioner told him that he had left his wallet at home. Mr. Peoples offered to go back to retrieve Petitioner's wallet; however, Mr. Peoples never returned the wallet to Petitioner. Mr. Peoples testified that he had been to the Boleyjack residence before because he was dating one of the daughters. Mr. Peoples testified that he left his gun at a friend's house after the robbery. Mr. Peoples denied that Petitioner ever had a gun.

On cross-examination, Mr. Peoples did not recall testifying that Mr. Beples picked up the victim's wallet and that Mr. Peoples never touched the victim's property. He testified that it was possible that Mr. Beples might have given him "the [victim's] stuff" when they met up at "the girl's house." Mr. Peoples testified that he hid the gun and Petitioner's wallet behind a dresser in an upstairs bedroom of the Boleyjack residence.

Mr. Beples testified that he was fourteen or fifteen years old when he witnessed his cousin, Mr. Peoples, commit the robbery. Mr. Beples did not see Petitioner give the gun to Mr. Peoples and did not know where Mr. Peoples got the gun. Mr. Beples denied that either he or Mr. Peoples were ever in possession of Petitioner's wallet. Mr. Beples denied his own involvement in the robbery but admitted that he accepted a plea agreement in juvenile court for this incident. Mr. Beples testified that he fled after witnessing Mr. Peoples commit the robbery, that he went straight to his grandmother's house, and that he did not recall going to the Boleyjack residence. Mr. Beples also testified that his memory of the incident was "spotty" because of his heavy drug use at the time. Mr. Beples testified that he was never contacted by Petitioner's trial counsel.

Trial counsel testified that he had been practicing law for nearly twenty years and that almost all of his practice was criminal defense. Trial counsel testified that he had represented Petitioner on several prior occasions and was retained to represent Petitioner in this case. However, trial counsel testified that he was going through a divorce from his wife at the time and was also one of the primary caregivers for his terminally ill father. Trial counsel testified that he had a heavy caseload, including three or four non-capital first degree murder cases. However, trial counsel believed that he spent "an appropriate amount of time with [Petitioner's] case."

Trial counsel knew that Petitioner was being tried under a theory of criminal responsibility. His trial strategy was to argue that Petitioner did not have the gun and did not commit the robbery. Trial counsel testified that he explained the concept of criminal responsibility to Petitioner in layman's terms and that he thought that it was "clear" that Petitioner understood their discussion. Trial counsel explained that he did not pursue an alibi defense because Petitioner admitted that he was at the store.

Trial counsel testified that his investigation of this case consisted of his going through discovery materials, watching the surveillance footage, and going to the scene of the crime. Trial counsel admitted that he did not speak to "very many" witnesses. Trial counsel testified that he spoke to Petitioner once or twice while Petitioner was in jail and that his legal assistant also spoke to Petitioner; however, trial counsel's name did not appear on the jail log of attorney visits. Trial counsel testified that he typically did not give incarcerated clients all of the discovery materials because of the risk of other inmates reading it and interfering with the case. Trial counsel testified that he went over all of the discovery materials with Petitioner but that he did not recall if certain statements were missing from the discovery.

Trial counsel testified that the prosecutor communicated "a couple" of plea offers, including one for six years followed by one for eight years closer to trial. Trial counsel testified that Petitioner rejected the plea offers because they involved sentences to serve. Trial counsel testified that he conveyed all plea offers to Petitioner but that Petitioner

maintained his innocence. Trial counsel did not believe that any offer that included jail time would be acceptable to Petitioner and strongly believed that they would prevail at trial.

Trial counsel testified that he was informed by the prosecutor late in the discovery process about a wallet being found that allegedly belonged to Petitioner. Trial counsel recalled seeing pictures of the wallet but not the actual wallet. He did not seek a continuance after learning about the existence of the wallet or make a contemporaneous objection to the admission of the photographs of the wallet's contents during trial. Trial counsel explained that he did not see a good-faith basis for objecting. Trial counsel told Petitioner that the wallet was a significant piece of evidence that they would have to explain at trial.

Trial counsel testified that he did not speak to either of Petitioner's codefendants prior to their respective guilty pleas because their attorneys would not allow him to speak to them. Trial counsel admitted that he also did not speak to either codefendant after they had entered their pleas. Trial counsel testified that the codefendants' statements to police were contained in the discovery and were not helpful to Petitioner's case. Based on information that trial counsel had, he did not believe either codefendant would testify against Petitioner. When trial counsel learned shortly before trial that Mr. Peoples would be a witness for the State, he did not seek a continuance or object to his testifying.

Trial counsel did not recall receiving in the discovery a supplemental police report documenting Officer Abbott's interview with a witness at the scene named Angela Clegget. According to the supplement, Ms. Clegget pulled into the parking lot of the store as the robbery was in progress. However, Ms. Clegget did not know until she later spoke to Officer Abbott that what she had witnessed was a robbery. She described a black male wearing a black shirt, dark hat, and shorts. She saw this man pull up his shirt and display a pistol in his waistband. Then she saw this man and another subject run off in different directions. Trial counsel agreed that Ms. Clegget's description of what she witnessed was consistent with Mr. Peoples's trial testimony that he did not point his gun at the victim but simply showed it to him. Trial counsel testified that if he had known about Ms. Clegget's statement, he would have attempted to interview her to determine if she could be helpful to Petitioner's case as the only known independent witness. Trial counsel acknowledged that the officer who prepared the report, Officer Abbott, testified at trial and that his supplement would have constituted *Jencks* material.[2]

Petitioner testified that he was not present during the robbery and that he was not involved. Petitioner admitted that he walked to the store with his codefendants.

---

[2] *See Jencks v. United States*, 353 U.S. 657 (1957); Tenn. R. Crim. P. 26.2 (commonly referred to as the Tennessee *Jencks* Act).

Petitioner was planning to buy some cigars but received a phone call and went outside. Petitioner then left the store about five minutes before his codefendants and eventually went to the Boleyjack residence. Petitioner wished Ms. Boleyjack's daughter happy birthday, then got something to drink and sat on the porch. Petitioner testified that he went back into the house before he heard the police outside calling his name "on a PA system." Petitioner ran into a bathroom to dispose of ecstasy pills that he had in his possession before surrendering to the police. Petitioner testified that the victim then "pointed at me and said I was the one that robbed him."

Petitioner testified that he only discussed "bits and pieces" of the case with trial counsel. Petitioner called trial counsel several times, but trial counsel never answered the phone. Petitioner requested that trial counsel provide him with discovery materials on several occasions, but he did not receive a complete copy of the discovery until after his sentencing hearing. On one occasion, Petitioner spoke to trial counsel's secretary, who told him that trial counsel was "too good to give out discoveries." During the ten months between Petitioner's arraignment and trial, Petitioner was brought to court a number of times but often did not see or speak to trial counsel. Petitioner did not know the status of his case or what the evidence against him would be at trial. Petitioner testified that he had known trial counsel for a long time and "that wasn't the [trial counsel] that [he] knew when [he] was being represented" in previous cases.

Additionally, trial counsel did not inform Petitioner until the day before trial of the wallet discovered at the Boleyjack residence. Petitioner testified that he had his wallet in his possession and could only speculate that he dropped it while in the Boleyjack residence. Petitioner did not deny that the wallet found belonged to him. Petitioner did not know how the victim's identification got into his wallet and denied that Mr. Peoples was ever in possession of his wallet. Petitioner agreed that trial counsel told him that the wallet "was going to be the hardest thing of the defense." Petitioner asked trial counsel to request a continuance, but trial counsel said that the prosecutor would not agree to it. Other than the wallet, Petitioner did not know what the evidence against him would be at trial. Petitioner did not know he was being tried under a theory of criminal responsibility until the prosecutor began explaining it to the jury. Petitioner also did not learn that Mr. Peoples would be testifying against him or the substance of his testimony until he took the witness stand at trial.

Petitioner testified that trial counsel never spoke to him about any plea offers. Petitioner was informed of a potential plea offer by Mr. Peoples's attorney, wherein Petitioner would be sentenced to twelve years and Mr. Peoples would be sentenced to eight years. Petitioner was also informed of a plea offer for six years by an "associate" of trial counsel in March. However, Petitioner did not accept that offer because he was told that "there wasn't no evidence against [him]." Petitioner testified that if he had known

about the evidence that would be used against him at trial, he would have taken the six-year offer.

Ms. Clegget testified during the evidentiary hearing, but her testimony is not included in the transcript. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn.1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," *see* Tenn. R. App. P. 24(b). Failure to do so risks waiver of the issue. *Id*. In the absence of an adequate record on appeal, this Court must presume that the post-conviction court's summary of Ms. Clegget's testimony contained in the order denying relief is accurate. *See State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012) (citing *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)) (creating a "presumption that the missing transcript would support the ruling of the trial court"). Ms. Clegget agreed with the substance of her statement to Officer Abbott contained in the supplemental police report. Ms. Clegget testified that she did not get a good look at the robbery because it happened quickly. She did not see property taken or a gun pointed at the victim. She did not see anyone wearing a white shirt and a green hat. Ms. Clegget testified that she was never contacted by either the prosecutor or trial counsel and that if she had been contacted sooner, she might have remembered more details.

In the order denying relief, the post-conviction court found that trial counsel was experiencing several personal problems and had a heavy caseload during his representation of Petitioner. As to the allegation that trial counsel failed to adequately investigate the case and prepare for trial, the post-conviction court found that trial counsel never interviewed either of Petitioner's codefendants, even after learning that one of them would be testifying for the State at trial. Trial counsel also did not interview any of the other State's witnesses, did not visit Petitioner in jail, did not present testimony at Petitioner's bond hearing, and did not inform Petitioner of the status of his case until the day before trial. The post-conviction court found that trial counsel did explain the theory of criminal responsibility to Petitioner.

The post-conviction court found that trial counsel knew about the existence of the wallet found at the Boleyjack residence four to six weeks before trial but did not discuss it with Petitioner until the eve of trial.[3] The post-conviction court found the wallet to be "highly inculpatory" and trial counsel's failure to even discuss it with Petitioner to be "inexplicable." Trial counsel believed that he could argue that the wallet may have been

---

[3] The post-conviction court noted that according to the trial testimony, the wallet was turned over to police in October 2008 and that it was unclear why there was an approximately eight-month delay in the State providing the evidence to trial counsel.

manipulated because it was found well after Petitioner's arrest. However, the post-conviction court found this theory to be "pure conjecture" because trial counsel did not conduct an investigation to provide an evidentiary basis for it. Trial counsel did not seek a continuance or object at trial to either the admission of the wallet or the testimony of Mr. Peoples, who was a late addition to the State's witness list, thereby waiving the issue on appeal.

The post-conviction court agreed with Petitioner's allegation that trial counsel failed to adequately communicate with him. The post-conviction court found that trial counsel "had some substantive discussions about the merits of the State's case with the general consensus of both parties that the State's case was relatively weak." Petitioner rejected plea offers presented to him based on this assessment of the evidence. The post-conviction court found that trial counsel failed to communicate with Petitioner once he became aware of the existence of the wallet and the fact that Mr. Peoples would be testifying for the State until the eve of trial. The post-conviction court found that trial counsel's failure to discuss "clearly inculpatory evidence" with his client during the process of plea negotiations to be "objectively insupportable by any applicable standard of attorney performance."

However, the post-conviction court found that trial counsel's deficient performance did not undermine the reliability of the trial outcome. Petitioner did not present any evidence that trial counsel's interviewing Mr. Peoples or any subsequent follow-up investigation would have resulted in the development of exculpatory evidence or led to a different outcome at trial. The post-conviction court found that Mr. Peoples gave "varying versions of the robbery from the outset of this case and his various versions contain numerous inconsistencies." The post-conviction court determined that Mr. Peoples's testimony at the evidentiary hearing "was so incredulous that the Petitioner himself refuted his account of the events." Additionally, Petitioner did not provide a legal basis to exclude the wallet from evidence and did not provide an alternative explanation of how the victim's identification came to be inside it. As to trial counsel's failure to adequately advise Petitioner regarding any plea offers, the post-conviction court found Petitioner's testimony that he would have accepted a plea offer if he had known of the evidence against him "to be suspect" and that there was no evidence that the plea offer was even still available.

As to the alleged *Brady* violation, the post-conviction court found that Petitioner had failed to prove that trial counsel requested the supplemental report from the State, that the State suppressed the evidence, or that the statement would be favorable or material to his defense. Even though "Ms. Clegget was not listed as a witness and her name was not referenced in any of the available discovery," the post-conviction court found that trial counsel could have found her through reasonable investigation after Officer Abbott testified but that he did not make a request for *Jencks* material. The post-

conviction court noted that Ms. Clegget's testimony would have been favorable to Petitioner because she did not see him at the scene but that her testimony would not have "exonerate[d] [Petitioner] from providing the gun and instructions to Mr. Peoples" before the robbery. Petitioner argued that Ms. Clegget's testimony could have been used to impeach the victim's statement that Mr. Peoples pointed the gun at him, but the post-conviction court found this claim to be "without merit" because her statement did not "directly refute" the victim's account.

As to Petitioner's request for a writ of error coram nobis, the post-conviction court found that Ms. Clegget's statement qualified as newly discovered evidence. Post-conviction counsel argued that the supplemental police report was not discovered until September 2014, which the State did not dispute. However, the post-conviction court found that Petitioner did not establish that he was without fault in failing to present the evidence in a timely manner because trial counsel could have requested the report as *Jencks* material after Officer Abbott testified. Additionally, the post-conviction court found that "Ms. Clegget's testimony would not have led to a different result."

*Analysis*

On appeal, Petitioner argues that he received ineffective assistance of counsel and that the State violated his right to due process under *Brady* by failing to turn over exculpatory evidence, namely the police report containing Ms. Clegget's eyewitness statement. We shall address each issue in turn.

*I. Standard of Review*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). This Court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley*, 960 S.W.2d at 578). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields*, 40 S.W.3d at 458.

## II. Ineffective Assistance of Counsel

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Burnett v. State*, 92 S.W.3d 403, 408 (Tenn. 2002). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. While "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," courts may consult the American Bar Association's Standards for Criminal Justice and Tennessee Supreme Court's Rules of Professional Conduct in evaluating an attorney's performance. *Strickland*, 466 U.S. at 688-89; *see also Baxter*, 523 S.W.2d at 932. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. In order to put the State to its proof, counsel "should interview not only his own witnesses but also those that the government intends to call, when they are accessible." *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982) (quoting *Baxter*, 523 S.W.2d at 932-33). Additionally, counsel has a duty to communicate with the defendant regarding the evidence against him and the status of the case in order for the defendant to make reasonably informed decisions. *See* Tenn. Sup. Ct. R. 8, RPC 1.4. "Counsel should confer with his client without delay" and "should discuss fully potential strategies and tactical choices with his client." *Id.* Counsel also has a duty to timely communicate formal plea offers to a defendant, *see Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012), and to render effective assistance in advising a defendant whether to accept a plea offer, *see Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012).

This Court must evaluate questionable conduct from the attorney's perspective at the time, *Hellard*, 629 S.W.2d at 9, and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). This Court will not use hindsight to second-guess a reasonable trial strategy, *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn.

Crim. App. 1994), even if a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad*, 938 S.W.2d at 369). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, but for counsel's unprofessional errors, "the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). The petitioner is not required to show that he would have been acquitted; a showing of a "reasonable probability of being found guilty of a lesser charge, or [receiving] a shorter sentence" is sufficient to satisfy the prejudice prong. *Brimmer v. State*, 29 S.W.3d 497, 508 (Tenn. Crim. App. 1998).

The post-conviction court determined that trial counsel's performance was deficient when he failed to investigate and discuss key evidence with Petitioner. Trial counsel knew about the discovery of Petitioner's wallet for four to six weeks but did not discuss it with Petitioner until the eve of trial. Trial counsel also failed to conduct any investigation to support his theory that the wallet could have been tampered with prior to its discovery. Additionally, trial counsel failed to interview Mr. Peoples even after he had entered his guilty plea and was no longer represented by counsel. Particularly once trial counsel learned that Mr. Peoples would be testifying for the State, the post-conviction court found that the "better practice" would have been for trial counsel to interview him, which may "have given some direction to [trial counsel] on where to focus his investigation and his cross-examination." Trial counsel did not seek a continuance or object at trial to either the admission of pictures of the wallet or the testimony of Mr. Peoples, thereby waiving those issues on appeal. The post-conviction court found that trial counsel's failure to discuss "clearly inculpatory evidence" with his client, especially during the process of plea negotiations, to be "objectively insupportable by any applicable standard of attorney performance." We agree with the post-conviction court's determination that trial counsel's performance in representing Petitioner was deficient.

As for the prejudice prong of the *Strickland* analysis, the post-conviction court found that Petitioner did not present any evidence that "interviewing Mr. Peoples or the subsequent follow-up investigation would result in the development of any exculpatory evidence or lead to a different result at trial." The post-conviction court found Mr.

- 13 -

Peoples's testimony at the hearing, which contradicted much of his trial testimony, to be "so incredulous that the Petitioner himself refuted his account of the events." *Cf. State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006) (citing *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999)) (holding that, as one of the factors for whether a new trial should be granted based upon recanted testimony, the court must be "reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true"). Additionally, the post-conviction court found that trial counsel's failure to call Mr. Beples as a witness did not result in prejudice because Mr. Beples was an "entirely unreliable witness who admitted to being under the influence of drugs when he gave his initial statement to police." We will not reevaluate a witness's credibility on appeal. *See Fields*, 40 S.W.3d at 456 (holding that issues of witness credibility are to be resolved by the post-conviction court). Finally, the post-conviction court found that Petitioner offered no legal basis for excluding the wallet from evidence and failed to show that any investigation would produce evidence that could provide a reasonable alternative explanation for how the victim's property ended up in Petitioner's wallet. We agree with the post-conviction court's assessment that trial counsel's deficient performance in preparing for trial and communicating with Petitioner did not result in an unreliable outcome at trial.

Finally, we note that trial counsel's failure to discuss "highly inculpatory evidence" with Petitioner and his reassurances "that there was not enough evidence against [Petitioner] to be convicted" may have had an impact upon Petitioner's decision to reject a favorable plea offer from the State and proceed to trial.[4] *See Lafler*, 132 S. Ct. at 1386 (holding that, "[e]ven if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence"). However, Petitioner only briefly mentioned trial counsel's failure to adequately communicate with him during the plea negotiation process in his amended petition and did not address the issue in his brief on appeal. Therefore, this issue has been abandoned, *see Ronnie Jackson, Jr. v. State*, No. W2008-02280-CCA-R3-PC, 2009 WL 3430151, at *6 n.2 (Tenn. Crim. App. 2009), *perm. app. denied* (Tenn. Apr. 16, 2010), and we will not analyze whether Petitioner would be able to establish that "the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384. Moreover, the post-conviction court found "to be suspect" Petitioner's assertion that he would have accepted a six-year offer had he known what the evidence against him would be at trial given Petitioner's "steadfast claim of innocence." Again, we will not second-guess the credibility determinations of the post-conviction court on appeal. *See Fields*, 40 S.W.3d at 456. Petitioner is not entitled to relief on this ground.

---

[4] Even when a defendant maintains his innocence, he may enter into a best-interest guilty plea under *North Carolina v. Alford*, 400 U.S. 25 (1970), or a nolo contendere plea.

### III. Brady Violation

"Every criminal defendant is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution." *Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). In the landmark case of *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson*, 38 S.W.3d at 56. Additionally, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case.'" *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). However, the State is not required to disclose evidence that the accused already possesses or is otherwise able to obtain. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

In order to establish a due process violation under *Brady* and obtain post-conviction relief, the petitioner must show that he made a proper request for the evidence "unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused;" that the State suppressed the evidence; and that the undisclosed evidence was both favorable and material. *State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993); *see also State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Whether a petitioner is entitled to a new trial based upon a *Brady* violation "presents a mixed question of law and fact." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

> The lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness.

*Id.* We shall discuss each element in turn.

#### 1. Request for the evidence

First, we must determine whether trial counsel requested the evidence or whether it was obviously exculpatory, thereby triggering the State's duty to disclose it. "When

the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976), *as modified by United States v. Bagley*, 473 U.S. 667, 667 (1985). However, there is no evidence in the record that trial counsel made a specific request for the police report. The post-conviction court found that "[a]lthough Ms. Clegget[] was not listed as a witness and her name was not referenced in any of the available discovery," trial counsel could have made a request for *Jencks* material after Officer Abbott testified. *See* Tenn. R. Crim. P. 26.2.[5] However, no such request was made during the course of the trial. Post-conviction counsel argued that trial counsel's discovery motion included a request for "the names and addresses of all persons known to the district attorney general or other law enforcement officers to have been present at the time and place of the alleged offense," which certainly would have included Ms. Clegget. However, even though post-conviction counsel quoted from a pre-trial discovery motion in the post-conviction petition, during argument at the hearing, and in the appellate brief, no discovery request was entered as an exhibit at the hearing. Allegations contained in pleadings, counsel's arguments and statements of facts contained in an appellate brief, and counsel's statements made in open court are not evidence. *See State v. Bennett*, 798 S.W.2d 783, 789 (Tenn. Crim. App. 1990); *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Therefore, based on the evidence before us, we cannot conclude that trial counsel made a request for the evidence.

The United States Supreme Court has held that in the absence of a specific request for evidence, the prosecution is still required to disclose any obviously exculpatory evidence. *See Agurs*, 427 U.S. at 106. Exculpatory evidence is defined as "[e]vidence tending to establish a criminal defendant's innocence." Black's Law Dictionary (10th ed. 2014). The *Brady* rule also encompasses impeachment evidence, which "may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676. The exculpatory nature of the evidence must be evaluated from the perspective of the prosecutor. *See Spurlock*, 874 S.W.2d at 609 (citing *Bagley*, 473 U.S. 667; *Agurs*, 427 U.S. 97); *Marshall*, 845 S.W.2d at 232. "Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs*, 427 U.S. at 108. Petitioner has consistently maintained that the value of the evidence at issue is its potential impeaching impact upon the testimony of the victim. Therefore, it is not until the victim testified inconsistently with Ms. Cleggett's account that the exculpatory nature of the evidence would have become apparent and triggered the State's duty to disclose.

---

[5] It is well-established that when a police officer testifies on direct examination regarding his investigation, a police report may constitute a "statement" of the officer under *Jencks* and Tennessee Rule of Criminal Procedure 26.2. *See State v. Robinson,* 618 S.W.2d 754, 760 (Tenn. Crim. App. 1981).

## 2. Suppression of the evidence

Next, we must determine whether the State suppressed the evidence. As discussed above, the post-conviction court found that trial counsel failed to make a request for *Jencks* material after Officer Abbott testified. The post-conviction court opined that, based on the prosecutor's open-file discovery policy, "it is reasonable to infer the State would have provided [the police report] if requested." However, the post-conviction court also noted that, because of the open-file policy, such requests are rarely made in Davidson County where defense attorneys assume "that all reports are already included in the file." This Court has held that an open-file discovery policy "does not discharge [the prosecution's] affirmative duty under *Brady* to disclose favorable, material evidence." *Jordan*, 343 S.W.3d at 98 (relying on *Strickler*, 527 U.S. at 238 n.23). In fact, "an incomplete response to a *Brady* request may mislead the defense into thinking that certain evidence does not exist," *Freshwater v. State*, 354 S.W.3d 746, 760 (Tenn. Crim. App. 2011) (citing *Bagley*, 473 U.S. at 682-83), rendering a specific request for it during trial even more unlikely. While the State is not required to disclose its entire file in order to satisfy the requirements of *Brady*, *see Bagley*, 473 U.S. at 675, a defendant is "entitled to rely on the [S]tate's assertion that it provided him with its entire file." *Jordan*, 343 S.W.3d at 98. Because the police report containing Ms. Clegget's statement was not included in the pre-trial discovery provided to trial counsel, despite the State's open-file discovery policy, and was not disclosed after the victim's testimony rendered the impeaching nature of the evidence apparent, we conclude that the State did suppress evidence. However, a new trial is only required if the suppressed evidence is both favorable and material. *See Bagley*, 473 U.S. at 677 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)) (holding that a new trial is not required "'whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict'").

## 3. Favorability of the evidence

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." *Johnson*, 38 S.W.3d at 55-56. Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensible, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness." *Id.* at 56-57. Favorable evidence also includes "information that would have enabled defense counsel to conduct further and possibly fruitful investigation." *Id.* at 56 (quoting *Marshall*, 845 S.W.2d at 233).

The post-conviction court first stated that Ms. Clegget's statement would have been favorable because she did not see Petitioner at the scene of the robbery. Later in its

order, however, the post-conviction court stated that "it is unclear how her testimony was necessarily favorable or material" because she did not witness the entire robbery, did not realize that what she witnessed was a robbery, and did not "directly refute" the victim's account. However, favorable evidence need not directly refute the State's theory of the offense so long as it "provides some significant aid to the defendant's case." *Johnson*, 38 S.W.3d at 56. Whether Ms. Clegget witnessed the entire robbery or whether she subjectively understood that what she saw was a robbery in progress are both irrelevant in determining whether the undisclosed evidence is favorable.

Ms. Clegget described the perpetrator as a male black between eighteen and twenty wearing a black shirt, dark hat, and shorts. Given that other evidence in the record indicated that Petitioner was in his thirties and was wearing a white shirt and a green hat, the record supports the post-conviction court's finding that Ms. Clegget did not see Petitioner at the scene. Additionally, Ms. Clegget saw the suspect pull up his shirt and display a pistol in his waistband, contradicting the victim's testimony that the robber pointed the gun at his head and chest. While the manner in which the robber used or displayed a deadly weapon is irrelevant under the aggravated robbery statute, *see* T.C.A. § 39-13-402, her statement does "call[] into question a material, although not indispensible, element of the prosecution's version of events." *See Johnson*, 38 S.W.3d at 57. Finally, she saw two subjects fleeing the scene, whereas the State's theory was that three individuals were involved. As Ms. Clegget was the only independent eyewitness to the robbery, production of the police report would have enabled trial counsel to interview her at a time when the events were fresher in her memory. *See id.* at 56 (quoting *Marshall*, 845 S.W.2d at 233). Upon our de novo review of the record, we conclude that the police report was favorable to Petitioner's defense.

### 4. Materiality of the evidence

Evidence is considered material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different." *Bagley*, 473 U.S. at 682.[6] The petitioner need not prove that disclosure of the evidence would have resulted in an acquittal. *See Kyles*, 514 U.S. at 434. "Nor is the test of materiality equivalent to that of evidentiary sufficiency, such that we may affirm a conviction or sentence when, 'after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.'" *Johnson*, 38 S.W.3d at 58 (quoting *Strickler*, 527 U.S. at 275). Rather, the question is whether in the absence of the evidence, the petitioner received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The petitioner must show that "the favorable evidence could reasonably be taken to

---

[6] "The 'materiality' aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim." *Cauthern*, 145 S.W.3d at 598 (citing *Bagley*, 473 U.S. at 682).

put the whole case in such a different light as to undermine confidence in the verdict." *Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998) (citing *Edgin*, 902 S.W.2d at 390). A reviewing court should evaluate the evidence "'in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense' been made aware of the favorable information." *Spurlock*, 874 S.W.2d at 619 (quoting *Bagley*, 473 U.S. at 683). In other words, "the materiality of the suppressed evidence must be evaluated within the context of the entire record." *Jordan v. State*, 343 S.W.3d 84, 97 (Tenn. Crim. App. 2011).

The post-conviction court found that the police report and Ms. Clegget's subsequent testimony were not material. The post-conviction court reasoned that because the State's theory was that Petitioner's involvement took place prior to the actual robbery, the fact that Ms. Clegget did not see Petitioner commit the robbery "does not exonerate him from providing the gun and instructions to [Mr.] Peoples." Whether the suppressed evidence completely exonerates the accused is not the test for materiality under *Brady*. *See Kyles*, 514 U.S. at 434.

Instead, Petitioner argued that the value of the suppressed evidence was its impeaching impact upon the testimony of the victim. Ms. Clegget corroborated Mr. Peoples's trial testimony that he merely lifted his shirt and showed his gun to the victim. This contradicts the victim's testimony that the robber pulled out the gun and pointed it at his head. This may have caused the jury to discredit the victim's testimony, including his description of Petitioner "eyeing" him in the store prior to the robbery. However, it does not discredit Mr. Peoples's trial testimony that Petitioner provided him with the gun and instructed him to rob the victim.[7] This testimony was the key to the State's case against Petitioner. By corroborating Mr. Peoples's version of events, Ms. Clegget's testimony would serve to bolster his credibility. Even if Ms. Clegget's statement would have caused the jury to completely discount the victim's testimony, it would not have cast "the whole case in such a different light as to undermine confidence in the verdict." *Irick*, 973 S.W.2d at 657. Because Petitioner failed to show that the evidence was material, he is not entitled to relief.

---

[7] Petitioner argues on appeal that Mr. Peoples attempted to recant and revise his statement to police implicating Petitioner during his testimony at trial. However, the transcript of the trial shows that Mr. Peoples simply stated that he did not remember the facts as read by the prosecutor at his own plea submission hearing. After having his recollection refreshed and speaking to an attorney—supposedly about the consequences of committing perjury—Mr. Peoples testified that Petitioner provided him with the gun and instructions. At no point during the trial did Mr. Peoples deny Petitioner's involvement. In fact, Mr. Peoples only stated that he lied to Detective Stewart with regard to whether Petitioner first instructed Mr. Beples to commit the robbery. The first time that Mr. Peoples testified that Petitioner was not involved in the robbery was during the motion for new trial hearing. The trial court apparently discredited that recantation, just as the post-conviction court discredited his similarly recanting testimony at the post-conviction hearing.

Finally, we note that in petition and argument before the lower court, Petitioner raised this issue with respect to the undisclosed police report under a writ of error coram nobis. The post-conviction court analyzed the issue separately under both the standard for a petition for writ of error coram nobis and as a constitutional violation under a petition for post-conviction relief. *See Gdongalay P. Berry v. State*, No. M2015-00052-CCA-R3-ECN, 2016 WL 1161216, at *14 (Tenn. Crim. App. Mar. 23, 2016) (analyzing a *Brady* claim separately from a coram nobis claim with respect to the same evidence), *perm. app. denied* (Tenn. Aug. 18, 2016). We note that the post-conviction court applied the incorrect standard to its resolution of the coram nobis claim. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002) (holding that the lesser "may have resulted in a different judgment" standard applies to claims under a writ of error coram nobis rather than the "would have" standard under *Brady*). On appeal, Petitioner frames the issue of the undisclosed police report as a constitutional violation under *Brady* without citing the standard applicable to a writ of error coram nobis. Therefore, we deem Petitioner's coram nobis claim to be abandoned. *See Ronnie Jackson, Jr.*, 2009 WL 3430151, at *6 n.2; *see also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument [or] citation to authorities . . . will be treated as waived in this court.").

## *Conclusion*

Based on the foregoing, we affirm the post-conviction court's rulings with respect to both the claim of ineffective assistance of counsel and the violation of due process under *Brady*.

_____
TIMOTHY L. EASTER, JUDGE

- 20 -